JUDGE CROTTY

14 CV 9786

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

SYLVIA LIND

*Plaintiff,*

-against-



**COMPLAINT**

MAJOR LEAGUE BASEBALL OFFICE
OF THE COMMISSIONER,
ALLAN H. "BUD" SELIG and
FRANK ROBINSON

**PLAINTIFF DEMANDS
TRIAL BY JURY**

*Defendants.*

**ECF CASE**

-----------------------------------------------------------x

Plaintiff, Sylvia Lind ("Lind" or "plaintiff"), by her attorney Ricardo A. Aguirre,

Esq., complaining of the Defendants Major League Baseball Office of the Commissioner

("BOC") (also known as "MLB"),   Allan H. Selig ("Selig") and Frank Robinson

("Robinson") hereby alleges as follows:

## Preliminary Statement

1.       Plaintiff Lind has been employed by Major League Baseball since November

21, 1995 and, upon information and belief, is the highest ranking Hispanic female in a

management position.  Early on in her career she experienced disparate treatment in MLB's

legal department, but she had, as Commissioner Selig likes to say, "hope and faith" that her

diligence, intelligence, perseverance and drive would ultimately be rewarded. However, as

time passed, she began noticing the trend of males being predominantly hired and

1

overwhelmingly appointed to executive level positions. Very few, if any, minority females were hired and appointed to executive positions; and in an industry where nearly 40% of the players are foreign-born (most of whom are from the Caribbean and Latin American), not one Hispanic female was hired or appointed to an executive position.

2.      In 1991, an African-American attorney named Jimmie Lee Solomon was hired as Director of Minor League Operations. For 15 years Lind worked diligently for Mr. Solomon by taking on all projects, dealing with personnel within and outside MLB and tackling a myriad of challenges.

3.      On or about June 4, 2012, Mr. Solomon was fired by BOC and his position became vacant. At no time was the position announced and posted for hire, nor was Lind considered or interviewed for the position, even though she carried out the duties and responsibilities of that office on a daily basis, and had the qualification, educational credentials and professional license. Instead, in keeping with its practice and pattern of recruiting, appointing, promoting and retaining men for their executive positions, MLB replaced Mr. Solomon with a gentleman whose formal education and professional credentials paled in comparison to Lind's achievements; BOC filled Mr. Solomon's position with MLB Hall of Fame legend Frank Robinson.

4.      From July, 2012 to the present, while acting cordial and seemingly friendly on a personal level, on a professional level Robinson has subjected Lind to repeated discriminatory actions that were deleterious to Lind's career and resulted in Lind experiencing severe emotional distress. In this short period of time, Robinson promoted Ben Baroody, a white male in his twenties and a prior subordinate of Lind, five times and

subsequently placed him in charge of plaintiff. Baroody had substantially less professional experience and inferior educational credentials compared to plaintiff. Robinson, without just cause, stripped Lind of a majority of her projects and responsibilities, including overseeing the All-Star "Futures Game" at MLB's annual All Star Week, an event she help to create and supervised since its inception. Robinson forced Lind to take direction from his daughter, Nichelle, a non-MLB employee, in matters Lind was competent in dealing with without Ms. Robinson's intervention. Robinson made false, unsupported and harmful hearsay allegations that were slanderous, libelous and damaging to her professional reputation. Robinson would request Lind send him frequent written updates, but he regularly failed to read them. He would accuse Lind of not completing a task while documents were either in his email or placed on his desk. Lastly, Robinson gave Lind disparaging and demoralizing evaluations that lacked substantive and truthful support to justify his actions.

5.      Then on or about May, 2014, during a meeting to discuss Lind's poor evaluation, Robinson uttered the words that encapsulated BOC's practice and policy of not recruiting, hiring, promoting and retaining minority females, specifically Hispanic female professionals. When speaking about the hiring practice in MLB, Robinson stated:

*"Sometimes you have to hire a man because there are places women can't go.  Well, I guess they can go most places now, but sometimes it's easier to hire a man because of what it is they'll be dealing with."*

6.      This diversity proceeding is brought to remedy discrimination on the basis of gender, age and national origin in the terms and conditions of BOC's unlawful employment

practices, in violation of New York State Human Rights Law, New York Executive Law § 296 et seq (the "Executive Law"; and the Administrative Code of the City of New York § 8-107 et seq. (the "Administrative Code"). Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate and legal and equitable relief pursuant to the Executive Law and the Administrative Code.

## THE PARTIES

7.      Plaintiff is an American citizen and Hispanic female of Cuban decent, and resides in the State of New Jersey. She is employed by BOC as the Director of Baseball Initiatives in the Baseball Office of the Commissioner.

8.      Defendant Major League Baseball Office of the Commissioner is the executive office within MLB that, inter alia, is ultimately responsible for the recruiting, hiring, training and retention of all executives and managerial positions. Furthermore, BOC is responsible for creating and executing diversity hiring and anti-discrimination policies that are geared towards inclusion of potential hirees and employees of protected classes as defined by Title VII of the Civil Rights Act of 1964. Their office is located at 245 Park Avenue in the County of New York and City and State of New York.

9.      Defendant Bud Selig, is employed as the Commissioner of Major League Baseball and is responsible for administrative oversight and the overall operation of MLB that includes but not is not limited to the appointment, training, supervision, promotion and discipline of executive, managerial and non-managerial employees in MLB, including the individually named defendants herein. Upon information and belief, Selig is a citizen of the State of Wisconsin.

10.     Defendant Frank Robinson is employed by MLB as the Executive Vice President of Baseball Development and was inducted in the National Baseball Hall of Fame. Upon information and belief, he is a citizen of the State of California.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 (a)(1) and (c) (1), because the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.

12.     As the Southern District of New York is the district where a substantial part of the events giving rise to the claim occurred, venue is proper within the District pursuant to 28 U.S.C. § 1391(b)(2).

13.     Pursuant to § 8-502(c) of the New York City Administrative Code, plaintiff will serve a copy of the Complaint on the City of New York Commission of Human Rights and the Corporation Counsel of the City of New York.

14.     Plaintiff has filed a charge of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC). When plaintiff receives a Right to Sue Notice, she will seek to amend the Complaint to add claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). The facts set forth here are those relevant to that claim as well, and therefore, there will be no prejudice to defendants by this procedure.

## JURY DEMAND

15.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action on each and every one her claims.

## FACTS COMMON TO ALL COUNTS

### Lind's Background and Employment History with MLB

#### *MLB Legal Department*

16.     Plaintiff earned her Juris Doctorate degree from Fordham University School of Law in 1995. Shortly thereafter she was employed by Major League Baseball on November 21, 1995 as Legal Supervisor in the legal department of MLB Properties, Inc., an affiliate of BOC. Her annual salary was approximately $43,000.00.

17.     At the time of hire, Lind was told by prospective manager Ethan Orlinsky, currently Senior VP & General Counsel of MLB Properties and then Deputy General Counsel, that there were two positions open and Lind was "overqualified for one" and "a little underqualified for the other." She was offered and accepted the position for which she was overqualified, Legal Supervisor, naively believing she would be able to prove herself and establish that she was in fact, not underqualified for the other position, that of Staff Attorney.

18.     Back then, plaintiff was the only Hispanic female lawyer in the legal department. In fact, upon information and belief, besides Lind, the legal department has never hired another Hispanic attorney.

19.     Several months later, Phil Kahn, a white male, was hired as staff attorney and was paid double plaintiff's salary.

20.     Jennifer Cohane (now Simms), plaintiff's direct supervisor at that time, routinely assigned work interchangeably "to Syl (*plaintiff*) or Phil," depending on who had the biggest volume of work, not based on the substantive nature of the task.

21.     While Lind worked in the MLB Properties Legal Department, she submitted a thorough memorandum outlining her job responsibilities and assignments in an attempt to secure a promotion, since she was performing substantially the same tasks as the staff attorney that was making double her salary. Lind was told that although she was an attorney, she wasn't *"acting as an attorney."* This despite the fact that she drafted, edited and negotiated legal agreements.

#### *Transfer to Minor League Operations in MLB*

22.     In June of 1997, plaintiff responded to an internal MLB job posting and was hired by Jimmie Lee Solomon (also an attorney) to the position of Supervisor of Minor League

Operations in the Baseball Office of the Commissioner (hereinafter referred to as "BOC"). A Masters of Business Administration degree or a Juris Doctorate degree were the educational requisites listed in the job description.

23.     The responsibilities listed for the position were somewhat significant, and Lind voiced her concern to Wendy Lewis, then Vice President of Human Resources, that (1) what was described there was really a manager level position, not a supervisor position and (2) despite an increase in responsibility, on paper it was actually a lateral move. Plaintiff was told that *"titles in Properties are inflated; this is really a promotion."*

24.     Lind requested an increase in salary to at least $50,000.00, but was told BOC could not increase her salary to that level since it was based on a salary increase percentage table. Mr. Solomon informed her that had she come from outside MLB to fill the position, she would have started at a considerably higher salary.

25.     In 1998, Mr. Solomon and plaintiff wrote the proposal to establish the "All-Star Futures Game" that was presented to then MLB President Paul Beeston. Beeston approved the concept and it became part of MLB's All-Star Week. Plaintiff coordinated and oversaw the Futures Game since its inception by selecting managers, field staff and participating players, and managing communications with Minor League Baseball, Major and Minor League Clubs, the newspaper "Baseball America", MLB.com and ESPN.

26.     After Mr. Solomon had been promoted to Senior Vice President, plaintiff was placed in charge of Minor League Operations. She oversaw the relationships with Minor League Baseball and the Major and Minor League Clubs, and developed and maintained the departmental budget. Lind was BOC's representative on the Major League General Manager's Player Development Committee and ran the twice-annual Major League Farm Directors Meetings.

27.     During the majority of plaintiff's tenure with Minor League Operations, the department consisted of Lind, Pat Scott, a coordinator (later senior coordinator), and Ana Cariello, an administrative assistant (Hispanic female) who was shared with International Baseball Operations and whose salary was under that budget

28.     In 2005, Mr. Solomon was promoted to Executive Vice President of Baseball Operations and, upon information and belief, was earning approximately $1.6 million dollars a year.

## Involvement in New Project Initiatives

29.     In February, 2006, the first Urban Youth Academy opened in Compton, California.  Plaintiff had been involved in the planning process by providing input on proposals, visiting potential sites in Southern California and occasionally consulting with the architect.

30.     In late 2006, Plaintiff's office developed the Civil Rights Game (hereinafter referred to as "CRG"), a series of events intended to celebrate people who perpetuated the spirit of the Civil Rights movement.  Defendant Selig approved the concept and the first event took place in 2007.  While planning the first two Civil Rights Games, plaintiff and Pat Scott were performing both their Minor League responsibilities and planning the CRG.

31.     On or about 2008 or 2009, Mr. Solomon directed Lind to focus solely on the CRG, the Urban Youth Academies, the Urban Invitational and other such projects, while he established a new department entitled, "Baseball Initiatives".  Although continuing to work with plaintiff on many projects, Scott remained a member of Minor League Operations.

## Hiring of Ben Baroody

32.     During the planning phase for the 2009 CRG in Cincinnati, Ohio, Scott took maternity leave and a temporary employee assisted Lind. Around that time, Mr. Solomon informed Lind that he would be requesting an additional permanent staff member for the Baseball Initiatives Unit, while Minor League Operations was still manned by two people.

33.     Ben Baroody (plaintiff's present supervisor), a white male in his twenties who had recently been hired in Major League Operations, was hired to be the coordinator in Minor League Operations to replace Scott, who left MLB shortly after she returned from maternity leave.  Upon information and belief, Ben Baroody did not have nor does he have educational credentials that are similar to plaintiff's credentials.

34.     In June, 2010, Mr. Solomon was reassigned to become Executive Vice President of Baseball Development, a position and department that did not previously exist.  Plaintiff was never considered nor offered neither the new position nor the now-vacated position of Executive Vice President of Baseball Operations, which was filled at that time with defendant Robinson.

8

35.     In the fall of 2010, during the 2011 budget planning process, Mr. Solomon submitted a Baseball Initiatives budget with a headcount of two. Subsequently, said budget was not approved.

36.     In February, 2012, Mr. Solomon wanted the Baseball Development department (which consisted of Baseball Initiatives, Minor League Operations and the Urban Youth Academies) to produce a 2011 Year-End Review.  It was chiefly drafted by plaintiff (as were the overwhelming majority of written documents, Power Point presentations, proposals, etc., in the department), with input from Darrell Miller, Fred Seymour and Ben Baroody.  It included a departmental organizational chart, which stated that at that time Baroody held the title of coordinator.  Plaintiff was director.

### Jimmie Lee Solomon Fired - Frank Robinson Hired

37.     On June 4, 2012, the day of the First Year Player Draft, Jimmie Lee Solomon was terminated by Selig.

38.     That evening at the First Year Player Draft at MLB Network, then Executive Vice President of Labor Relations Rob Manfred (now the Chief Operating Officer of MLB and the present Commissioner-elect of MLB) met with and informed plaintiff, Fred Seymour and Baroody that Selig's office was *"going to figure out"* what was going to happen, but that they should still proceed *"business as usual."*

39.     Plaintiff had reported directly to Mr. Solomon for many years, performed her duties with very little direction, and developed and implemented virtually all of his concepts and projects. Notwithstanding the extraordinary responsibility Lind had held at that point, neither Selig nor anyone from BOC, considered, discussed or offered Mr. Solomon's vacant position to plaintiff; despite the fact plaintiff was experienced, competent and maintained the educational credentials and professional license that qualified her for the position.

### Hall of Famer Frank Robinson Replaced Jimmie Lee Solomon

40.     On June 26, 2012, Baseball Hall of Famer Frank Robinson, then a special assistant to defendant Selig, was named Executive Vice President of Baseball Development.

41.     Upon information and belief, Robinson had only earned a high school diploma and did not maintain the skill set to qualify him as an executive vice president in a business oriented department in BOC.

### *June 2012 – Initial Working Relationship with Frank Robinson*

42.     Two weeks after Robinson was named, the MLB All-Star Game was played in Kansas City.   Because Pat Hemm, his newly acquired assistant, was working with the Commissioner during All-Star Week, Mr. Robinson expected Lind to handle various matters such as coordinating Resident Security Agents, getting him into the ballpark, etc.; basically menial tasks that were not within her job title description; and tasks she had never performed in the close to 15 years she worked for Mr. Solomon.

43.     These personal accommodations for Robinson were to be performed when plaintiff was already charged with a myriad of different responsibilities that included team oversight, intensive player needs and time-sensitive media requests.

44.     As Mr. Robinson began to formulate the department, he convinced Baroody to move over to Baseball Development from Minor League Operations, which was now back in Baseball Operations.  Baroody accepted the offer.

45.     After Baroody became an official member of the department, plaintiff was never informed of Baroody's official title nor the subsequent promotional titles until February, 2014; although she knew his title had been "Coordinator" a few months earlier.

46.     As the "new" department developed, plaintiff often asked for clarity as to her responsibilities because there were occasions wherein she sought information from another department related to a task that she had traditionally performed, only to learn that Baroody had already approached that same person.  In fact, she expressed this situation to Robinson that she and Baroody were *"stepping on each other's toes,"* which, for a petite unit in BOC that was attempting to establish its credibility, was professionally embarrassing. This dilemma would particularly occur when Robinson would ask Lind to perform a work task that he already had assigned to Baroody or vice versa.   He once told plaintiff that he had *"done it on purpose because he wanted to see how [we] would react."*

47.     On various occasions during the first several months, Robinson held conversations concerning the future of the department. He had decided that all the full-time staff members (plaintiff, Baroody, Vice President of Youth and Facility Development Darrell Miller and Compton Academy manager Don Buford) would all report directly to him, and none of the

staff to each other.  He explicitly told plaintiff on more than one occasion *"Ben is learning the ropes and you will still be the senior person."*

48.      Even though she had exercised extraordinary initiative and been afforded significant professional latitude and managerial discretion while working with Solomon for close to 15 years, in adjusting to a new supervisor, plaintiff was extraordinarily respectful of not making decisions without consulting with Robinson.  This included discussing business issues with Robinson and offering her analysis and advice (but leaving the decision up to him), as well as consulting with him prior to scheduling any business travel.

49.      Despite continued consultations with Robinson, at some point, he had requested more written status updates.  Plaintiff complied, only to find that on numerous occasions he failed to read the memos and emails he requested. Robinson would also dispute the submission of said memos and reports.

50.      In December 2012, shortly after the 2012 Winter Meetings, Robinson asked plaintiff to sit with him to discuss her performance.  He complained that Lind had not checked in with him regularly during the Winter Meetings and reiterated his request for more regular communication, both written and oral.

51.      Also in December 2012, Robinson asked plaintiff to provide an assessment of Baroody's performance.  Since Baroody only tacitly reported to plaintiff at the Futures Game and CRG, Lind did not present an in-depth report, but provided him with a brief opinion.  She stated that Baroody was intelligent and hard-working, but needed more seasoning, as there were numerous occasions where his instincts were ill-advised and would not best serve BOC or our department.  Mr. Robinson did not respond to her assessment nor did he make inquiries.

*Plaintiff's First Written Evaluation from Mr. Robinson*

52.      On or about late January or early February, 2013, Mr. Robinson handed plaintiff a written the evaluation, asked her to read it and then meet with him *"around 11."*  Plaintiff was shocked. It was an overwhelmingly negative, unbalanced and unsubstantiated evaluation.

53.      Plaintiff went to Robinson's office at 11:00 a.m. and found Ray Scott (an African American male), now Senior Vice President of Human Resources present. (The same Ray Scott that in June 2012 had inappropriately stated to Lind in an elevator *"Wow Sylvia! You Look*

*Hot!"*). Neither Scott nor any member of the human resources department had ever been present at any of plaintiff's prior evaluation discussions.

54.     Robinson continually told plaintiff *"...people don't like you."*   He never substantiated his statements by identifying the names of those persons that made those hearsay statements and whom Lind allegedly offended or treated unprofessionally.

55.     During this same meeting Mr. Robinson kept saying that plaintiff *"needed a wake-up call"* and that he was not *"trying to get rid of"* her.   There was not one positive statement on that evaluation.

56.     Contrary to the 5 month period evaluation in 2012, in late August 2013 during a phone conversation, Robinson complimented Lind's work on the Civil Rights Game, which had taken place a few days earlier.  He said he thought everything seemed very well organized and that the show was very good despite there only having been one honoree present.

57.     During that conversation, Robinson requested a "wrap up" memorandum synopsizing the event. Lind told him *"I'll do one better"* and explained that she would not only include what had transpired in 2013 but what was necessary for the game to *"move to the next level."* Shortly thereafter, plaintiff submitted a 4,000 word treatise that was a comprehensive analysis of the Civil Rights Game, with recommended improvements for nearly every aspect of said event.

### Unwarranted Reassignment of Plaintiff's Duties and Responsibilities

58.     On or about September 16, 2013, Robinson summoned Plaintiff to his office to discuss the reorganization of the department.  Ray Scott was present.

59.     Without just cause or reason, Robinson informed Lind she would be chiefly responsible for the Civil Rights Game and dealing with broadcast matters related to Academy events and nothing else.  Robinson stated Baroody would be *"in charge"* of the Academies, the Breakthrough Series, the Urban Invitational and the Futures Game.

60.     Plaintiff was shocked by Robinson's managerial decision and respectfully shared her disappointment and concern over being stripped of her responsibilities without just cause, specifically the event she co-created and oversaw since 1999, the All Star Futures Game. Plaintiff stated: *"When you say 'Futures Game' to ESPN, Baseball America, MLB.com, they*

*think of me. If I am still at MLB and you put someone else in charge of the Futures Game, you are making a statement that I did something wrong and you took it away from me."*

61.     Robinson stated said he would *"think about"* the Futures Game and get back to plaintiff. He never did.

62.     A few months later, Plaintiff was surprised to learn through a mass email distributed by another department that Baroody was scheduled to make a Futures Game presentation to Major League Farm Directors at the annual Winter Meeting, an assignment Lind had always assumed. Despite Robinson knowing that talking to Farm Directors about the Futures Game was an explicit reason for plaintiff's attending the Winter Meetings, and despite Baroody knowing Lind was to be in attendance, neither ever personally gave her advance notice that Baroody would be making any such presentation. During the meeting (more than an hour into it), Baroody sent an email to plaintiff and stated, *"I'm going to give a brief overview of the Futures Game, if you want to stick around."*

63.     These events caused plaintiff to experience significant professional embarrassment, humiliation and emotional distress.

### *Unsubstantiated Allegations of Plaintiff's Job Performance*

64.     During the aforementioned September meeting, Mr. Robinson made the absentminded, incredulous, unsubstantiated and defamatory statement that, *"Oh, and people are complaining about your drinking."* Lind was alarmed and distressed by this comment and responded, *"What?"* He stated plaintiff had allegedly been drinking and *"missing meetings"* out of town. Lind was outraged and exclaimed *"That is an absolute lie. I have never missed a meeting!"* Robinson responded *"Never? That's an awful long time."* Plaintiff replied, *"Well, if I had gone out of town and missed the very meeting I had gone there for, that's pretty big and I believe I would remember that."*

65.     Lind asked Robinson to specify what meetings she allegedly missed and identify the individuals that promulgated these lies. Robinson acted as if he was trying to remember and Scott asked if it was at the All-Star Game - which that year was held at Citifield in the County of Queens and City and State of New York. After a pause Robinson stated, quite unconvincingly, *"the Civil Rights Game,"* which clearly contradicted the compliments he made to plaintiff for the

good job she had done on the event just two weeks earlier. Scott warned Robinson that if he were to make such serious allegations he needed the *"who, where, when"* to substantiate such claim.

66.     This incident is evidence of Robinson's attempt to besmirch plaintiff to justify his discriminatory and disparate treatment against plaintiff.

### *Mr. Robinson's Directive to Work with His Daughter (Non-MLB Employee)*

67.     In planning the Civil Rights Game, the unit selects honorees each year for the MLB Beacon Awards.  For 2014, Motown Records founder Berry Gordy, Robinson's family friend was selected as a potential honoree.

68.     In December 2013, Robinson instructed plaintiff to call his wife, Barbara, and ask if she would inquire whether Mr. Gordy would be willing to be honored.  Lind called Mrs. Robinson and spoke with her.  However, instead of Mrs. Robinson following up with plaintiff, it was Robinson's daughter, Nichelle, who contacted plaintiff.

69.     Robinson's daughter was not and is not an MLB employee or executive, and is not authorized to direct or supervise MLB or BOC employees.

70.     Robinson's daughter immediately made demands and gave Lind directives.  She requested the honoree invitation letter be sent to her so she could forward it to Mr. Gordy. Lind complied but Nichelle kept requesting changes to the letter, which was essentially a form that in the past had been sufficient to secure the attendance of celebrities such as Academy Award winner Morgan Freeman, Rock and Roll Hall of Famer Carlos Santana and boxing legend Muhammad Ali.

71.     Because Nichelle kept changing her mind, for efficiency's sake, Lind sent her a word document and invited her to make any changes she wished.

72.     On or about January 7, 2014, plaintiff received a voicemail message from Nansci LeGette, C.E.O. of Berry Gordy's company, saying she received MLB's letter and Mr. Gordy would love to accept the honor.  Lind called her back, and informed her of the process and event. Lind immediately called Mr. Robinson to inform him of the good news and her conversation with Ms. LeGette.

73.     Lind contacted Nichelle and left her a message, thanking her for her assistance. Later that day, Nichelle, called Lind and asked, somewhat outraged, *"They called you directly? How did they get your number?"*  Plaintiff replied *"It was on the letter."*  She said *"I changed*

the letter." Nichelle then stated she *"will handle all communication with Mr. Gordy's office from now on."*

74.     Shortly thereafter, Lind called Robinson and very delicately relayed to him what Nichelle had said and explained that it would challenging for the plaintiff not to deal directly with the honoree's staff, as was customarily done.   Plaintiff asked Robinson, *"Is this what you want me to do?"*  Robinson did not respond.  Plaintiff then asked, *"Is this what you're asking me to do?"*  Robinson said, *"Yes, please."*

75.     At no time did defendant Executive Vice President Frank Robinson intervene and cease his daughter's involvement in this matter; instead, he insisted plaintiff continue to take direction from a non-MLB employee and subjected her to continued harassment and hostile work environment.

76.     Acting as though she was plaintiff's supervisor, Nichelle later asked for a synopsis of what plaintiff and Ms. Legette had discussed. Plaintiff sent the report and copied MLB's public relations and entertainment consultant Ken Krasner, an MLB.com Vice President. Nichelle said she did not know Mr. Krasner and that she would decide *"who, if anyone, at MLB [would] be in direct contact with Mr. Gordy's office."*

77.     Plaintiff was made to feel that as a Hispanic female she was not qualified to interact with the African-American community, despite the fact that in the past she interacted with numerous ethnic groups, including the African-American community.

### *Plaintiff's Second Evaluation from Robinson*

78.     On February 18, 2014, Robinson informed Baroody and Lind that he would be conducting their evaluations.  Plaintiff went in the office first.  Robinson had not given Lind a written evaluation and, according to him, he had yet to do one.  He stated that he was not sure if he had to do the written evaluation first and said he was going to check with Ray Scott.  It was later confirmed to plaintiff that it is against MLB policy to not provide an employee with a written evaluation prior to discussion.

79.     When Robinson conducted the oral evaluation, he was overwhelmingly positive. Robinson said he saw vast improvement in Lind's work performance and she was communicating very well with him.  He stated he had observed Lind in meetings and was really appreciative of the way she was handling herself and the work.  He even said to plaintiff *"You do*

*not get the respect you deserve around here."* Robinson also reiterated that plaintiff had *"so much knowledge about so many things"* and *"so much experience,"* and he *"feel[s] better"* when she's at meetings with him because he feels he is *"covered."* Robinson said he sometimes brought plaintiff to meetings related to projects she was not working on and it was *"questioned"* and he said *"I want her here because she has so much knowledge."* He said that if there was anything, Lind could still improve a little on communication, as *"people"* (as always, unidentified) say plaintiff does not always respond promptly enough.

80.     During the same meeting, Robinson noted that plaintiff needed to communicate better with Baroody. As it was a regular request from Robinson to both Baroody and plaintiff that they needed to communicate better with each other, Plaintiff informed Robinson she continually updates Baroody of what she is doing, but he regularly fails to reciprocate.

81.     It was when plaintiff asked if the communication was supposed to be mutual that Robinson informed Lind, almost as an afterthought, that <u>Baroody was being promoted again (the 5th time – or at least, five levels – in two years)</u>, and plaintiff would be reporting to Baroody as her immediate supervisor. Robinson gave no substantive reason for his decision, other than to say that he could not be in New York as much as before, and *"someone has to be in charge while [he's] gone."* Lind informed Robinson she was extremely disturbed by this decision, <u>because comparatively speaking, Baroody, a young white male, did not have the same or close to the same educational credentials, professional license nor the substantial employment experience and considerable industry knowledge she had in MLB.</u> Robinson insisted he was not trying to *"get rid of"* plaintiff or *"push [her] out,"* and begged her to *"give [him] a year."* Providing no explanation of what was to happen in a year, but intimating that it somehow would be something positive for plaintiff's career, Lind stated she did not believe she could do that.

### *Plaintiff's Second Written Evaluation*

82.     On Monday, March 17, 2014, Plaintiff received an automated email informing her she had *"an action required"* on her written performance appraisal. She had not been previously informed by Robinson or his assistant that a written evaluation had even been drafted. The evaluation was fundamentally opposed to what had been discussed with plaintiff orally and again was overwhelmingly disparaging, prejudicial, and libelous, causing plaintiff great distress while on vacation. Plaintiff refused to respond to the review until she had consulted with counsel.

83.   Plaintiff responded on or about Sunday, April 6.  In her response, plaintiff gave BOC, Selig and Robinson *actual notice* that Robinson's actions were discriminatory in nature, on the basis of age, gender and national origin.  She wrote:

*"It is unfortunate that my supervisor views the evaluation process as an opportunity for character assassination.  What is contained here is merely a pretextual attempt to dismiss my considerable skills and qualifications and justify his supplanting me with a young white male."*

84.   On or about April 9, 2014, Ron Rydell of MLB's Human Resources Department called and explained that when employees entered comments on their appraisal, he *"like[s] to meet with them."*  This assertion, however, is contradicted by the fact that plaintiff also issued a response to her evaluation the prior year, and neither Rydell nor any other member of the human resources department solicited a meeting to further discuss her comments.  Clearly, the only reason she was contacted was due to the notice of discrimination.

85.   On or about Wednesday, April 16, 2014, plaintiff and Rydell met for close to 2 ½ hours.  He reviewed some of the history of her department and each statement in the written evaluation.  He stated he would meet with Robinson to discuss this matter, then the three of them would meet.

86.   On or about April 22, 2014 Rydell informed Lind that he had, in fact, met with Robinson.

### April 28, 2014 – Meeting Concerning Retaliatory Disciplinary Action

87.   On April 28, 2014, Robinson called plaintiff from California and directed plaintiff to go to the Vincent Room at MLB headquarters on the 29th floor at 9:30 a.m. where Baroody and Ron Rydell would be, along with a letter to plaintiff from Robinson.  Robinson said he would be on the phone and they would discuss.

88.   Upon arriving plaintiff was informed she was the subject of a Disciplinary Action for "Unprofessional Conduct – Insubordination".

89.   The alleged insubordinate act stemmed from plaintiff's communication with a Karen Chatman, a former business consultant plaintiff (as well as others in the department) dealt with when she worked for Jimmie Lee Solomon.

90.   Robinson blamed plaintiff of *"assuming things"* when plaintiff, in her email to Ms. Chatman (the sending of which had been approved in advance by Robinson), asked Ms.

Chatman to *"let us know"* if she was no longer represented by a former baseball player turned agent with whom their department had been dealing.

91.     Plaintiff had made it a point to discuss and keep Robinson informed of any dealings with Ms. Chatman and he and Baroody had both been copied on the message.

92.     This absurd accusation was a blatant pretextual act of retaliation by Robinson against plaintiff for the response she made to her written evaluation.

93.     Prior to the aforementioned disciplinary action, Plaintiff was never disciplined for insubordination.

94.     This sanction by Robinson, permitted by defendants BOC and Selig, is in direct retaliation for the notice plaintiff gave to MLB about his and their discriminatory practices.

### *April 29, 2014 - Rydell's Inappropriate and Unprofessional Slanderous Comment*

95.     On or about April 29, 2014, plaintiff's friend and former colleague, Ana Rivas (formerly Ana Cariello) met for lunch.

96.     While enjoying their lunch outside of MLB headquarters, Rivas saw Mr. Rydell pass by and confided to plaintiff that she had been meeting with Rydell to discuss her own employment issues. Later that week, Rivas told plaintiff that afterwards Mr. Rydell had told Rivas that he had seen her together with plaintiff and said, in some and substance, *"I'm not going to tell you who to hang out with, but you may not want to spend time with her; she's angry."*

97.     According to Rivas, she explained to Rydell that she used to report to plaintiff and that they had been friends for many years.

98.     As an employee tasked with addressing and preventing discrimination and hostile work environments in MLB, Rydell's comment was grossly unprofessional, inappropriate and a violation of MLB policy to intimate about confidential personnel matters.

### *May 20, 2014 – Follow up Meeting – Robinson's Blatant Discriminatory Remark*

99.     On or about May 20, 2014, plaintiff's unit was scheduled to have a department meeting *"around 2:30,"* which led Lind to believe it was a *"wrap-up,"* meeting since it was Robinson's last day in the office for a few weeks.

100.     When Lind arrived, Baroody and Rydell were in the office with Robinson. They had plaintiff's *"amended"* review in their hands.  After plaintiff read the amended review, the meeting commenced.

101.     Robinson spoke for quite some time, addressing a myriad of topics, claiming Lind's recollection of the "oral" evaluation was vastly different than his, that last year's review was *"not what [he] wanted to write but [she] needed a "wake-up call,"* admitting that plaintiff is *"a very smart young woman"* but alleging that she has *"a lot of things [she] need[s] to work on,"* saying that for all the time she had been at MLB she should be *"higher"* (in title and pay), but that she blames everyone else and *"needs to look in the mirror because the problem is you"*, without specifying what the alleged problem was.

102.     Robinson stated that he had done something he had never done in 60 years in baseball and that was *"invest in someone."* He said he *"invested"* in plaintiff and he *"got kicked in the face."* He was clearly offended that he had *"said things to try to make plaintiff better"* and, in his view, plaintiff responded with *"personal attacks."* Robinson was unable to articulate what constituted this alleged *"investment"*.

103.     Robinson asserted that when he hires someone he does not see color or gender. He also went into a non sequitur about the *"type"* of people available to hire and that *"people of color, there are very few of us in this building"* and contending that there are very few people of color or women among the intern pool (which was ironic considering both interns in the Baseball Development department for the past two years have been minorities).

104.     Astonishingly, Robinson went on to say that,

   *"Sometimes you have to hire a man because there are places women can't go.  Well, I guess they can go most places now, but sometimes it's easier to hire a man because of what it is they'll be dealing with."*

105.     Rydell and Baroody were witness to Robinson's statement, but made no comment nor made any attempt to assert they disagreed with Robinson's disparaging remark.

106.     Plaintiff was shocked and stunned and did not immediately respond and rebut Robinson's discriminatory declaration.

107.     After Robinson's lengthy discussion, when asked to respond, plaintiff stated *"I don't have anything to say."*  Robinson glared at Lind incredulously and asked, *"You have*

*nothing to say? I can't believe you have nothing to say."* He said *"You sit here and don't say anything and then you put all these negative things in writing. You have never said anything negative to me in person."*

108.   Robinson later stated that he had been told by Rydell that he needed to communicate with plaintiff more when he was unhappy with her work; wherein he unequivocally, aggressively and offensively stated he would not do that, because if he did, *"we would be doing it every day and there wouldn't even be time to do any work."* He stated he will never again have a serious conversation with plaintiff alone.

109.   Rydell wrapped up the meeting by reiterating that with the disciplinary action already issued, *"any insubordination or violation of the employee handbook"* could subject plaintiff to further discipline, and that Lind should keep that in mind. He further stated that it seemed *"there was an impasse here"*, but communication was very important.

110.   Rydell suggested that perhaps Mr. Robinson and plaintiff should talk without him and Baroody present; whereupon Mr. Robinson once again stated he would never again have a serious discussion with plaintiff again without another person present.

111.   Rydell informed plaintiff that he would send her the evaluation requesting her signature as merely an acknowledgement of receipt, not an admission of or concurrence with what is contained therein. He requested that it be signed by the end of the week, as they would like to "wrap up the whole evaluation process by the end of the month." Lind never signed the amended evaluation.

<u>*Second Retaliatory Act*</u>

112.   Shortly after the aforementioned disciplinary action, Plaintiff was directed to report to a conference room at MLB headquarters to submit to a urinalysis test for the detection of controlled substances and/or alcohol.

113.   Although MLB employees annually receive notification that they, like the baseball players, are subject to drug testing, during her two-decade tenure at MLB – BOC, Lind was never directed to submit to drug and alcohol testing.

114.   It is clear that defendants subjected plaintiff to said testing in an attempt to find alcohol in her system in an effort to substantiate Robinson's allegation and subsequently have cause to terminate her employment at MLB.

115.    This attempt by defendants to inculpate plaintiff and substantiate Robinson's allegation is in direct retaliation for the notice plaintiff gave to MLB about their discriminatory practices.

*Facts Outlining Defendants Discriminatory Policies and Practices*

116.    The aforementioned paragraphs detailed defendants discriminatory policies and practices, and the disparate treatment plaintiff experienced throughout her 19 years as an employee of BOC. The following paragraphs are additional facts that support plaintiff's assertion that discrimination is prevalent when it concerns senior Hispanic female employees in MLB.

117.    As a 48-year old Hispanic female in the white male dominated industry known as Major League Baseball, plaintiff has consistently been subjected to being passed over for promotions and not being considered for positions she qualified for, nor receiving the pay commensurate with those promotion positions.

118.    Since plaintiff's arrival at MLB in November, 1995, upon information and belief, there have been a total of only four Hispanic individuals, all males, among MLB Properties, the Office of the Commissioner and MLB Advanced Media who have achieved a title of Vice President or above. They are Lou Melendez, who was Vice President of International Baseball Operations and was, upon information and belief, "encouraged" to take early retirement; Julio Carbonell, who was Vice President of Information Technology and was dismissed from employment with MLB in 2008; John Quinones, current Vice President of Recruiting; and Steve Gonzalez, current Vice President of Labor.

119.    There are currently no fewer than 52 individuals who hold the title of Vice President or above; upon information and belief, Quinones and Gonzalez are the only Hispanics.

120.    Of the 52 MLB Vice Presidents only 12 are women; and of the 12 women there are only 2 minority female Vice Presidents, neither of whom are Hispanic.

121.    No Hispanic females hold the title of Vice President or above within MLB's executive branch, nor have any held such a title during plaintiff's two-decade tenure.

122.    Upon information and belief, defendant Robinson lacks the educational credentials, professional license and executive experience to qualify as an Executive Vice President in a business oriented department in BOC for which he is paid over $1 million.

123.   When Robinson first joined BOC as the first Vice President of On-Field Operations, he hired a white male in his twenties as his right hand.  When that person left to work for the Texas Rangers, he hired another white male in his twenties to replace him.  Upon being appointed Executive Vice President of Baseball Development, he recruited Baroody, a white male in his twenties into the department, promoting him five levels in less than two years.

124.   Baroody lacks the professional license, industry intelligence and executive experience to qualify as plaintiff's supervisor, receive five promotions and be paid more than plaintiff.

125.   The practice and pattern of shunning older Hispanic females and hiring young, white males to be afforded the opportunities to achieve the title of Vice President is supported, encouraged and permitted by Major League Baseball and the Baseball Office of the Commissioner. This was made crystal clear when Mr. Robinson stated: *"Sometimes you have to hire a man because there are places women can't go.  Well, I guess they can go most places now, but sometimes it's easier to hire a man because of what it is they'll be dealing with."*

126.   The officials of MLB cannot state they are unaware of plaintiff's qualifications. In 2006, Lind was honored in Albany, N.Y. by the New York State Hispanic Legislative Caucus' women's organization "Entre Nosotras" and N.Y.S. Assemblywoman Carmen Arroyo as the highest ranking Hispanic female in Major League Baseball. Shortly thereafter, defendant Selig sent her a congratulatory letter for receiving this award and recognition.

127.   Prior to her disciplinary sanction in 2014, in plaintiff's prior 18 years, she had, to her knowledge, never been given any disciplinary action. Robinson orchestrated this action against plaintiff to retaliate for the notice she wrote concerning his and BOC's discriminatory practices.

128.   If plaintiff was such a disciplinary liability and not qualified for promotion, then why have BOC and MLB utilized plaintiff's skills in the following manner:

a)   Until Robinson took over, although not rewarded with commensurate title and salary, plaintiff was given extraordinary responsibility and the latitude to exercise significant professional discretion. She served as the point person on numerous matters, causing her to deal directly with MLB Club Owners, Presidents, General Managers and other Baseball Operations

personnel; Minor League Club Owners, Presidents and personnel; media members and various outside partners.

b)      In the fall of 2012 and the beginning of 2013, plaintiff was assigned as a Baseball Operations liaison to two World Baseball Classic ("WBC") teams, as she had been for the 2006 and 2009 WBC, even though she no longer worked in Baseball Operations.  Plaintiff regularly volunteered to assume more responsibility at the WBC venues; however, instead of appointing her to the San Juan, Puerto Rico venue where all four participating teams were Spanish speaking, defendants instead opted to appoint a non-Spanish speaking African-American male as a venue a coordinator, making plaintiff feel that even where it was most warranted, the services of a Hispanic employee were not welcome;

c)      Plaintiff was consistently chosen as MLB's spokesperson when interacting with the Hispanic media market on the Civil Rights Game, conducting several radio and television interviews, and plaintiff annually introduced the "Baseball & the Civil Rights Movement Roundtable" moderator live on mlb.com;

d)      Plaintiff is continually lauded by certain MLB departments, outside partners and participants in the Civil Rights Game both for her vision, intelligence and creativity, and the fact that each CRG has been a well-executed event; this despite the dearth of support (and, most often substantive opposition) outside the Baseball Development department;

e)      Plaintiff is still held in high regard by Minor League Baseball and MLB Club Baseball Operations personnel, with whom she worked closely for more than a decade;

f)      Plaintiff was told by defendant Robinson that her writing was "poor," yet she regularly wrote substantive memoranda and analyses while working with Mr. Solomon that he submitted directly to MLB owners and/or BOC. Plaintiff also wrote an acceptance speech for a Pulitzer Prize nominee and one of the most renowned authors and poets of our time, Maya Angelou, shortly before her death.  Dr. Angelou told Lind it was "very good" and changed only two or three sentences. Individuals that viewed the recorded speech, including "Good Morning America" anchor Robin Roberts (who was a friend of Angelou's) hailed it as "classic Maya" even though they were actually plaintiff's words;

g)      Robinson himself told plaintiff that he "liked to have [her] at meetings" because he felt "covered," due to plaintiff's "incredible experience, knowledge and intelligence".

Further, during the entire time he has known plaintiff, he has continually lauded her as "a real baseball person," both directly to plaintiff and to others.

129.   Exacerbating MLB's and BOC's discriminatory conduct is that the very nature of plaintiff's job is to plan, advance and promote an event (the Civil Rights Game) that perpetuates the fallacy that MLB truly cares about diversity and equality.  It has been plaintiff's continuous responsibility to "carry the water" explaining how conscientious MLB and BOC are about rights for all, when, in fact, plaintiff has experienced, all too well, that there is a very selective application of such rights.

130.   While plaintiff has always maintained a professional demeanor to the public and endeavored to do what is in the best interest for MLB, it has been extremely disheartening, utterly demoralizing and extraordinarily taxing on her, both emotionally and psychologically, to almost singlehandedly perpetuate what she has known to be the diversity and equal employment opportunity falsehood.

## FIRST CAUSE OF ACTION

### Gender Discrimination under the Executive Law against BOC, Selig and Robinson

131.   Plaintiff repeats and re-alleges paragraphs 1 through 130 above as if fully set forth herein.

132.   By the acts and practices described above, including but not limited to hiring males in managerial and executive positions, creating a hostile work environment for plaintiff because of her gender and failing to consider, interview, appoint and promote her to an executive position she was fully qualified to perform, BOC, Selig and Robinson discriminated in the terms and conditions of her employment on the basis of her gender in violation of the Executive Law.

133.   Defendant Selig is liable under the Executive Law as plaintiff's "employer" and as an "aider and abettor" of the discrimination against plaintiff.

24

134.    Defendant Robinson is liable under the Executive Law as an "aider and abettor" of the discrimination against plaintiff.

135.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Executive Law.

136.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of BOC's, Selig's and Robinson's discriminatory acts.

SECOND CAUSE OF ACTION

Gender Discrimination under the Administrative Code against BOC, Selig and Robinson

137.    Plaintiff repeats and re-alleges paragraphs 1 through 136 above as if fully set forth herein.

138.    By the acts and practices described above, including but not limited to hiring males in managerial and executive positions, creating a hostile work environment for plaintiff because of her gender and failing to consider, interview, appoint and promote her to an executive position she was fully qualified to perform, BOC, Selig and Robinson discriminated in the terms and conditions of her employment on the basis of her gender in violation of the Administrative Code.

139.    Defendant Selig is liable under the Administrative Code as an "aider and abettor" of the discrimination against plaintiff.

140.    Defendant Robinson is liable under the Administrative Code as an "aider and abettor" of the discrimination against plaintiff.

141.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Administrative Code.

142.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of BOC's, Selig's and Robinson's discriminatory acts.

143. BOC, Selig and Robinson acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

## THIRD CAUSE OF ACTION

### National Origin Discrimination under the Executive Law
### Against BOC, Selig and Robinson

144. Plaintiff repeats and re-alleges paragraphs 1 through 143 above as if fully set forth herein.

145. By the acts and practices described above, including but not limited to, defendants' failure to consider, interview, appoint and promote qualified Hispanic females to managerial and executive positions, and creating a hostile work environment for plaintiff because of her national origin, BOC, Selig and Robinson discriminated in the terms and conditions of her employment on the basis of her national origin in violation of the Executive Law.

146. Defendant Selig is liable under the Executive Law as plaintiff's "employer" and as an "aider and abettor" of the discrimination against plaintiff.

147. Defendant Robinson is liable under the Executive Law as an "aider and abettor" of the discrimination against plaintiff.

148. Defendant BOC is liable as plaintiff's "employer" pursuant to the Executive Law.

149. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of BOC's, Selig's and Robinson's discriminatory acts.

## FOURTH CAUSE OF ACTION

### National Origin Discrimination under the Administrative Code
### Against BOC, Selig and Robinson

150.    Plaintiff repeats and re-alleges paragraphs 1 through 149 above as if fully set forth herein.

151.    By the acts and practices described above, including but not limited to, defendants failure to consider, interview, appoint and promote qualified Hispanic females to managerial and executive positions, and creating a hostile work environment for plaintiff because of her national origin, BOC, Selig and Robinson discriminated in the terms and conditions of her employment on the basis of her national origin in violation of the Administrative Code.

152.    Defendant Selig is liable under the Administrative Code as plaintiff's "employer" and as an "aider and abettor" of the discrimination against plaintiff.

153.    Defendant Robinson is liable under the Administrative Code as an "aider and abettor" of the discrimination against plaintiff.

154.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Administrative Code.

155.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of BOC's, Selig's and Robinson's discriminatory acts.

156.    BOC, Selig and Robinson acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

## FIFTH CAUSE OF ACTION

### Age Discrimination under the Executive Law
### Against BOC, Selig and Robinson

157.    Plaintiff repeats and re-alleges paragraphs 1 through 156 above as if fully set forth herein.

158.    By the acts and practices described above, including but not limited to, defendants' failure to consider, interview, appoint and promote qualified Hispanic females to managerial and executive positions, and creating a hostile work environment for plaintiff because of her age, BOC, Selig and Robinson discriminated in the terms and conditions of her employment on the basis of her age in violation of the Executive Law.

159.    Defendant Selig is liable under the Executive Law as plaintiff's "employer" and as an "aider and abettor" of the discrimination against plaintiff.

160.    Defendant Robinson is liable under the Executive Law as an "aider and abettor" of the discrimination against plaintiff.

161.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Executive Law.

162.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of BOC's, Selig's and Robinson's discriminatory acts.

SIXTH CAUSE OF ACTION

Age Discrimination under the Administrative Code<br>Against BOC, Selig and Robinson

163.    Plaintiff repeats and re-alleges paragraphs 1 through 162 above as if fully set forth herein.

164.    By the acts and practices described above, including but not limited to, defendants failure to consider, interview, appoint and promote qualified Hispanic females to managerial and executive positions, and creating a hostile work environment for plaintiff because of her age, BOC, Selig and Robinson discriminated in the terms and conditions of her employment on the basis of her age in violation of the Administrative Code.

165.    Defendant Selig is liable under the Administrative Code as plaintiff's "employer" and as an "aider and abettor" of the discrimination against plaintiff.

166.    Defendant Robinson is liable under the Administrative Code as an "aider and abettor" of the discrimination against plaintiff.

167.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Administrative Code.

168.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of BOC's, Selig's and Robinson's discriminatory acts.

169.    BOC, Selig and Robinson acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

### SEVENTH CAUSE OF ACTION

#### Retaliation under the Executive Law against BOC, Selig and Robinson

170.    Plaintiff repeats and re-alleges paragraphs 1 through 169 above as if fully set forth herein.

171.    By the acts and practices described above, including but not limited to, subjecting plaintiff to a disciplinary action for an unsubstantiated act of insubordination and forcing plaintiff to provide a urine sample for controlled substance and/or alcohol testing, defendants retaliated against plaintiff for her allegation of discrimination, in violation of the Executive Law.

172.    Defendant Selig is liable under the Executive Law as plaintiff's "employer" and as an "aider and abettor" of the retaliation against plaintiff.

173.    Defendant Robinson is liable under the Executive Law as an "aider and abettor" of the retaliation against plaintiff.

174.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Executive Law.

29

175.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of BOC's, Selig's and Robinson's discriminatory acts.

EIGHTH CAUSE OF ACTION

Retaliation under the Administrative Code against BOC, Selig and Robinson

176.    Plaintiff repeats and re-alleges paragraphs 1 through 175 above as if fully set forth herein.

177.    By the acts and practices described above, including but not limited to, subjecting plaintiff to a disciplinary action for an unsubstantiated act of insubordination and forcing plaintiff to provide a urine sample for controlled substance and/or alcohol testing, defendants retaliated against plaintiff for her allegation of discrimination, in violation of the Administrative Code.

178.    Defendant Selig is liable under the Administrative Code as plaintiff's "employer" and is also liable under the Administrative Code as an "aider and abettor" of the retaliation against plaintiff.

179.    Defendant Robinson is liable under the Administrative Code as an "aider and abettor" of the retaliation against plaintiff.

180.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Administrative Code.

181.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of BOC's, Selig's and Robinson's retaliatory acts.

182.    BOC, Selig and Robinson acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

(a)     declaring the acts and practices complained of herein are unlawful and in violation of the New York State Executive Laws §296(1), §296(6), §296(7), the Administrative Code of the City of New York §8-107 and the common laws of the State of New York;

(b)     enjoining and permanently restraining these violations of the Executive Law and Administrative Code;

c)     directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

d)     directing defendants to place plaintiff in the position she would be in but for defendants discriminatory  and retaliatory treatment of her, and to make her whole for reputational damage and all earnings she would have received but for defendants discriminatory and retaliatory treatment including, but not limited to, wages, bonuses, equity interests, pension and other lost benefits;

e)     directing defendants to pay plaintiff punitive damages as provided by the Administrative Code

f)     awarding plaintiff such interest as is allowed by law;

g)     awarding plaintiff her reasonable attorney fees and costs; and

h)     granting such other and further relief as this Court deems necessary and proper.

Dated: Bronx, New York
      December 5, 2014

Ricardo A. Aguirre (RAA 7086)
Law Office of Ricardo A. Aguirre
Attorney for Plaintiff
644 Soundview Avenue – Suite 6
Bronx, New York 10473
Tel: 718-542-9300
Fax: 718-542-2244