UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

SYLVIA LIND,

                              *Plaintiff*,

     -against-

OFFICE OF THE COMMISSIONER OF
BASEBALL, an unincorporated association
doing business as MAJOR LEAGUE
BASEBALL,
ALLAN H. "BUD" SELIG and
FRANK ROBINSON,

                             *Defendants*.
**------------------------------------------------------------------x**

14-CV-09786 (PAC) (JLC)

SECOND AMENDED
COMPLAINT

PLAINTIFF DEMANDS
TRIAL BY JURY

ECF CASE

      Plaintiff Sylvia Lind ("Lind" or "plaintiff"), by her attorneys Alterman & Boop LLP and

Eisenberg & Schnell LLP, complaining of defendants Office of the Commissioner of Baseball

("BOC") (also known as "MLB"),  Allan H. Selig ("Selig") and Frank Robinson ("Robinson")

(collectively "defendants") alleges as follows:

<u>NATURE OF THIS ACTION</u>

      1.    Plaintiff brings this action to remedy discrimination on the basis of sex and

national origin in the terms and conditions of plaintiff's employment in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et</u> <u>seq</u>. ("Title VII") and the Administrative

Code of the City of New York § 8-107 <u>et</u> <u>seq.</u> (the "Administrative Code").  Lind also brings this

action to remedy defendants' retaliation against her for having engaged in activity protected

under Title VII and  the Administrative Code, including but not limited to plaintiff's opposition

to defendants' discriminatory practices and filing of an EEOC charge.   Plaintiff seeks injunctive

and declaratory relief, compensatory and punitive damages, and other appropriate and legal and equitable relief pursuant to Title VII and the Administrative Code.

2.      Lind has been employed by Major League Baseball since November 21, 1995 and, upon information and belief, is its highest-ranking Hispanic woman in a management position.  Early on in her career she experienced disparate treatment in MLB's legal department, but she had, as former Commissioner Selig likes to say, "hope and faith" that her diligence, intelligence, perseverance and drive would ultimately be rewarded. However, despite her qualifications, hard work, skills and accomplishments, Lind's career has stalled at the level of Director, while she has seen less qualified men and non-Hispanics advance.  In an industry where nearly 40% of the players are foreign-born, most of whom are from the Caribbean and Latin America, upon information and belief, MLB has not hired or appointed a Hispanic female to an executive position.

3.      Over Lind's almost twenty-year career, MLB has failed to properly acknowledge or pay her for her excellent work, reward her with an appropriate title for the work she did and to consider her for promotional opportunities.   MLB is a "boys' club" that passes over qualified women in favor of less qualified men. Instead, in 2012, when her manager of fifteen years, Jimmie Lee Solomon ("Solomon"), left MLB, rather than select Lind, who had been Solomon's point person for years and had with Solomon been responsible for lauded innovations for MLB including the Futures Game and the Civil Rights Game, MLB installed the legendary Frank Robinson as Lind's manager.

4.      Robinson was a great baseball player, but does not have Lind's skills. Unlike Solomon, who had given Lind wide discretion and allowed Lind to use her skills and abilities,

Robinson took Lind's responsibilities away, and sought to limit her to routine clerical and administrative work.  Over the two years Robinson was Lind's boss, he hired and groomed a younger less credentialed white man, Ben Baroody to take her place.  After first giving Baroody some of Lind's most significant responsibilities, Robinson demoted Lind still further by promoting Baroody yet again and making Lind report to him.  On or about May, 2014, during a meeting with Lind, Robinson uttered the words that encapsulated BOC's practice and policy of not recruiting, hiring, promoting and retaining minority females, specifically Hispanic female professionals, and explained why he gave Lind's job to Baroody:

> "Sometimes you have to hire a man because there are places women can't go.  Well, I guess they can go most places now, but sometimes it's easier to hire a man because of what it is they'll be dealing with."

5.   When Lind complained that her treatment was discriminatory, defendants began a campaign of retaliation.  Lind was given a performance warning for the first time in her distinguished career, was subjected to drug and alcohol testing for the first time in her career, was removed from her position and reassigned to a lesser job in Special Events, and finally moved from her office to a cubicle.  As a result of defendants' discriminatory and retaliatory treatment, by the end of March 2015, Lind was suffering from severe depression and panic attacks and was required to take a medical leave.

## PARTIES

6. Plaintiff is an American citizen and Hispanic female of Cuban decent, and resides in the State of New Jersey.  She was employed by MLB as the Director of Baseball Initiatives in

the Office of the Commissioner of Baseball until she was demoted in February 2015 to a position in Special Events.

7.      Defendant the Office of the Commissioner of Baseball, doing business as MLB, is an unincorporated association comprised of thirty Major League baseball clubs. The Office of the Commissioner is the executive office that, inter alia, is ultimately responsible for the recruiting, hiring, training and retention of all executives and managerial positions.  Furthermore, BOC is responsible for creating and executing diversity hiring and anti-discrimination policies that are geared towards inclusion of potential hirees and employees of protected classes as defined by Title VII.  Its office is located at 245 Park Avenue in the County of New York and City and State of New York.

8.      Defendant Allan H. "Bud" Selig, served as the Commissioner of Major League Baseball from 1992 until January of 2015 and was responsible for administrative oversight and the overall operation of MLB that includes but not is not limited to the appointment, training, supervision, promotion and discipline of executive, managerial and non-managerial employees in MLB.  Upon information and belief, Selig is a citizen of the State of Wisconsin.

9.      Defendant Frank Robinson was employed by MLB as the Executive Vice President of Baseball Development from June 2012 to early 2015. Upon information and belief, he is a citizen of the State of California.

JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 28 U.S.C. § 1343(a)(3), and supplemental jurisdiction for New York City Administrative Code§ 8-502 pursuant to 28 U.S.C. § 1367.  This

Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 (a)(1) and (c) (1), because the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.

11.     As the Southern District of New York is the district where a substantial part of the events giving rise to the claims occurred, venue is proper within the District pursuant to 28 U.S.C. § 1391(b)(2).

12.     Pursuant to § 8-502(c) of the New York City Administrative Code, plaintiff has served a copy of this Second Amended Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

<u>PROCEDURAL AND ADMINISTRATIVE REQUIREMENTS</u>

13.     Plaintiff has satisfied all of the procedural and administrative requirements set forth in § 706 of Title VII (42 U.S.C. § 2000e-5), in particular:

(a) Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission on or about May 27,  2014 and was assigned federal charge number 520-2014-02288.

(b) Plaintiff received a "Notice of Right to Sue" from the EEOC on or about January 2, 2015.

(c) The First Amended Complaint in this action was filed on February 10, 2015 within ninety (90) days of receipt of the Notice of Right to Sue.

<u>JURY DEMAND</u>

14.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action on her claims.

5

STATEMENT OF FACTS

Lind's Background and Employment History with MLB

MLB Legal Department

15.     Plaintiff earned her Juris Doctorate degree from Fordham University School of Law in 1995. Shortly thereafter she was employed by Major League Baseball on November 21, 1995 as Legal Supervisor in the legal department of MLB Properties, Inc., an affiliate of BOC. Her annual salary was approximately $43,000.00.

16.     At the time of hire, Lind was told by prospective manager Ethan Orlinsky, currently Senior VP & General Counsel of MLB Properties and then Deputy General Counsel, that there were two positions open and Lind was "overqualified for one" and "a little underqualified for the other."  She was offered and accepted the position for which she was overqualified, Legal Supervisor, naively believing she would be able to prove herself and establish that she was in fact, not underqualified for the other position, that of Staff Attorney.

17.     When plaintiff began her employment with MLB, she was the only Hispanic female lawyer in the legal department. Upon information and belief, besides Lind, the legal department has never hired another Hispanic attorney.

18.      Several months after plaintiff commenced her employment with MLB, Phil Kahn, a white male, was hired as staff attorney and was paid double plaintiff's salary.

19.     Jennifer Cohane (now Simms), plaintiff's direct supervisor at that time, routinely assigned work interchangeably "to Syl (plaintiff) or Phil," depending on who had the biggest volume of work, not based on the substantive nature of the task.

6

20.     While Lind worked in the MLB Properties Legal Department, she submitted a thorough memorandum outlining her job responsibilities and assignments in an attempt to secure a promotion, since she was performing substantially the same tasks as the staff attorney who was making double her salary. Lind was told that although she was an attorney, she wasn't "acting as an attorney." This despite the fact that she drafted, edited and negotiated legal agreements.

<u>Transfer to Minor League Operations in MLB</u>

21.     In June of 1997, plaintiff responded to an internal MLB job posting and was hired by Jimmie Lee Solomon (also an attorney) to the position of Supervisor of Minor League Operations in the Office of the Commissioner of Baseball.  The job description listed the educational requirements for the position as either a Masters of Business Administration degree or a Juris Doctor degree.

22.     The responsibilities listed for the position were somewhat significant, and Lind voiced her concern to Wendy Lewis, then Vice President of Human Resources, that (1) what was described there was really a manager level position, not a supervisor position and (2) despite an increase in responsibility, on paper it was actually a lateral move.  Plaintiff was told that "titles in Properties are inflated; this is really a promotion."

23.     Lind requested an increase in salary to at least $50,000.00, but was told BOC could not increase her salary to that level since it was based on a salary increase percentage table. Solomon informed her that had she come from outside MLB to fill the position, she would have started at a considerably higher salary.

24.     For fifteen years Lind worked diligently for Jimmie Lee Solomon by taking on all projects, dealing with personnel within and outside MLB and tackling a myriad of challenges.

7

25.     In 1998, Solomon and plaintiff wrote the proposal to establish the "All-Star Futures Game" that was presented to then MLB President Paul Beeston.  Beeston approved the concept and it became part of MLB's All-Star Week.  Plaintiff coordinated and oversaw the Futures Game from its inception by selecting managers, field staff and participating players, and managing communications with Minor League Baseball, Major and Minor League Clubs, the newspaper "Baseball America," MLB.com and ESPN.

26.     In or about 2000, Solomon gave plaintiff responsibility for Minor League Operations.  She oversaw the relationships with Minor League Baseball and the Major and Minor League Clubs, and developed and maintained the departmental budget.  Lind was BOC's representative on the Major League General Manager's Player Development Committee and ran the twice-annual Major League Farm Directors Meetings.

27.     In 2005, Solomon was promoted to Executive Vice President of Baseball Operations and, upon information and belief, was earning approximately $1.6 million dollars a year.

<u>Involvement in New Project Initiatives</u>

28.     In February 2006,  first Urban Youth Academy in Compton, California.  Plaintiff involved in the planning process by providing input on proposals, visiting potential sites in Southern California and occasionally consulting with the architect.

29.     In late 2006, Plaintiff's office developed the Civil Rights Game (hereinafter referred to as "CRG"), a series of events intended to celebrate people who perpetuated the spirit

8

of the Civil Rights movement.  Defendant Selig approved the concept, and the first event took place in 2007.

30.     In or about 2008 or 2009, Solomon directed Lind to focus solely on the CRG, the Futures Game, the Urban Youth Academies, the Urban Invitational and other such projects, while he established a new department entitled "Baseball Initiatives."

31.     In June, 2010, Solomon was reassigned to become Executive Vice President of Baseball Development, a position and department that did not previously exist.  Plaintiff was not considered for the new position or the now-vacated position of Executive Vice President of Baseball Operations, which was filled at that time with defendant Robinson.

32.     In February, 2012, the Baseball Development Department (which consisted of Baseball Initiatives, Minor League Operations and the Urban Youth Academies) produced a 2011 Year-End Review.  It was chiefly drafted by Lind, as were the overwhelming majority of written documents, Power Point presentations, proposals, etc., in the department.

<u>Jimmie Lee Solomon Fired – Frank Robinson Hired</u>

33.     On June 4, 2012, the day of the First Year Player Draft, Jimmie Lee Solomon's employment was terminated by Selig.

34.     That evening at the First Year Player Draft at MLB Network, then Executive Vice President of Labor Relations Rob Manfred ('Manfred") (now the Commissioner of MLB) met with and informed plaintiff, Fred Seymour and Ben Baroody that Selig's office was "going to figure out" what was going to happen, but that they should still proceed "business as usual."

35.     As of June 2012 plaintiff had reported directly to Solomon for almost fifteen years, performed her duties with very little direction, and developed and implemented virtually

all of his concepts and projects.  Notwithstanding her extraordinary responsibility and experience and despite the fact that Lind had met with Manfred after Solomon left and emphasized that she wanted a job commensurate with her skills and abilities, neither Selig, Manfred nor anyone from BOC, considered, discussed or offered Solomon's vacant position to plaintiff. Despite the fact the plaintiff was experienced, competent and maintained the educational credentials and professional license that qualified her for the position, she was not considered for or given Solomon's position.

36.     On June 26, 2012, Baseball Hall of Famer Frank Robinson, then a "special assistant" to defendant Selig, was named Executive Vice President of Baseball Development.

37.     Upon information and belief, Robinson had only a high school diploma and did not maintain the skill set to qualify him as an executive vice president in a business oriented department in BOC.

<u>June 2012 – Initial Working Relationship with Frank Robinson<br>and Hiring of Ben Baroody</u>

38.     Two weeks after Robinson was named, the MLB All-Star Game was played in Kansas City.  Because Pat Hemm, his newly acquired assistant, was working with the Commissioner during All-Star Week, Robinson expected Lind to handle various matters such as coordinating Resident Security Agents and getting him into the ballpark, etc.; clerical and menial tasks that were not within her job description; and tasks she had never performed in almost fifteen years she worked for Solomon.

39.     These personal accommodations for Robinson were to be performed by Lind though she was already charged with a myriad of different responsibilities that included team oversight, intensive player needs and time-sensitive media requests.  This was the beginning of

Robinson's effective demotion of plaintiff, who had been working at an executive level for years, to what Robinson viewed a woman's proper role, clerical, ministerial, non-supervisory tasks.

40.    In or about the late summer or early fall of 2012, Robinson recruited Ben Baroody, a young white male coordinator employed by MLB in Minor League Operations, to transfer to Baseball Development.

<u>Plaintiff's First Performance Evaluation from Robinson</u>

41.    On or about late January or early February, 2013, Robinson gave plaintiff her written performance evaluation for 2012. Plaintiff was shocked. It was an overwhelmingly negative, unbalanced and unsubstantiated evaluation.  For the first time in plaintiff's then seventeen-year career with MLB she was rated "does not meet expectations."   The year before plaintiff was rated "exceeds expectations" the highest rating, and Solomon praised her for showing "real tenacity and the brilliant ability to think on her feet."

42.    The same day plaintiff received her written review, she met at Robinson's request in his office and found Ray Scott MLB's then Senior Vice President of Human Resources present.  Ray Scott in June 2012 had inappropriately stated to Lind in an elevator "Wow Sylvia! You Look Hot!"  Neither Scott nor any member of the Human Resources Department had ever been present at any of plaintiff's prior evaluation discussions.

43.    Robinson told plaintiff "people don't like you."  He refused to give her any specifics so Lind could address any issue, if there really was one.

44.    In contrast to the written performance review for 2012, in late August 2013 during a phone conversation, Robinson complimented Lind's work on the Civil Rights Game, which

had taken place a few days earlier.  Robinson told Lind that everything seemed very well organized and that the show was very good despite there only having been one honoree present.

Robinson strips Lind of some of her key responsibilities and gives them to Baroody

45.    On or about September 16, 2013, Robinson summoned Plaintiff to his office.  Ray Scott was present.

46.    Robinson told Lind that going forward she would be only responsible for the Civil Rights Game and dealing with broadcast matters related to Academy events.  Robinson stated Baroody would be "in charge" of the Academies, the Breakthrough Series, the Urban Invitational and the Futures Game.

47.    Plaintiff was shocked by Robinson's decision and respectfully shared her disappointment and concern over being stripped of her responsibilities, specifically the event she co-created and oversaw since 1999, the All Star Futures Game. Lind stated: "When you say 'Futures Game' to ESPN, Baseball America, MLB.com, they think of me. If I am still at MLB and you put someone else in charge of the Futures Game, you are making a statement that I did something wrong and you took it away from me."

48.    Robinson stated he would "think about" the Futures Game and get back to plaintiff.  He never did.

49.    A few months later, Lind was surprised to learn through a mass email distributed by another department that Baroody was scheduled to make a Futures Game presentation to Major League Farm Directors at the annual Winter Meeting.  From the inception of the Futures Game, that presentation had been Lind's responsibility.  Despite the fact that Robinson knew that

talking to Farm Directors about the Futures Game was an explicit reason for plaintiff's attendance at the Winter Meetings, and despite Baroody knowing Lind was to be in attendance, neither one personally gave her advance notice that Baroody would be making the presentation. During the meeting (more than an hour into it), Baroody sent an email to plaintiff stating, "I'm going to give a brief overview of the Futures Game, if you want to stick around."

50.    Robinson's demotion of plaintiff and transfer of a significant part of her responsibly to Baroody caused plaintiff to experience significant professional embarrassment, humiliation and emotional distress.

51.    During the same September 16, 2013 meeting with Robinson and Scott in which Robinson told Lind he was giving most of her job duties to Baroody, Robinson made the incredulous, unsubstantiated and defamatory statement that, "Oh, and people are complaining about your drinking."   Lind was alarmed and distressed by this comment and responded, "What?"   He stated plaintiff had allegedly been drinking and "missing meetings" out of town. Lind was outraged and exclaimed "That is an absolute lie.  I have never missed a meeting!" Robinson responded "Never?  That's an awful long time."  Plaintiff replied, "Well, if I had gone out of town and missed the very meeting I had gone there for, that's pretty big and I believe I would remember that."

52.    Lind asked Robinson to specify what meetings she allegedly missed and identify the individuals who promulgated these lies. Robinson acted as if he was trying to remember and Scott asked if it was at the All-Star Game.  After a pause Robinson stated, quite unconvincingly, "the Civil Rights Game," which contradicted the compliments he made to plaintiff for the good

job she had done on the event just two weeks earlier.  Scott warned Robinson that if he were to make such serious allegations he needed the "who, where, when" to substantiate such claim.

<u>Robinson's Directive to Work with His Daughter (Non-MLB Employee)</u>

53.     In planning the Civil Rights Game, the unit selects honorees each year for the MLB Beacon Awards.  For 2014, Motown Records founder Berry Gordy, Robinson's family friend was selected as a potential honoree.

54.     Robinson's daughter, Nichelle Robinson, who is not an MLB employee, assumed responsibility for Mr. Gordy's invitation. She made demands upon Lind and gave her directives. She requested the honoree invitation letter be sent to her so she could forward it to Mr. Gordy. Lind complied but Nichelle Robinson kept requesting changes to the letter, which was essentially a form that in the past had been sufficient to secure the attendance of celebrities such as Academy Award winner Morgan Freeman, Rock and Roll Hall of Famer Carlos Santana and boxing legend Muhammad Ali.

55.     On or about January 7, 2014, plaintiff received a voicemail message from Nansci LeGette, C.E.O. of Berry Gordy's company, saying she received MLB's letter and Mr. Gordy would love to accept the honor.  Lind called her back, and informed her of the process and event. Lind immediately called Robinson to inform him of the good news and her conversation with Ms. LeGette.

56.     Lind contacted Nichelle Robinson and left her a message, thanking her for her assistance. Later that day, Nichelle Robinson, called Lind and asked, somewhat outraged, "They called you directly?  How did they get your number?"  Plaintiff replied "It was on the letter."

14

She said "I changed the letter."   Nichelle Robinson then stated she "will handle all communication with Mr. Gordy's office from now on."

57.     Shortly thereafter, Lind called Robinson and very delicately relayed to him what his daughter had said and explained that it would challenging for her not to deal directly with the honoree's staff, as was customarily done.

58.     Acting as though she was plaintiff's supervisor, Nichelle Robinson later asked for a synopsis of what plaintiff and Ms. LeGette had discussed. Plaintiff sent the report and copied MLB's public relations and entertainment consultant Ken Krasner, an MLB.com Vice President. Nichelle Robinson said she did not know Mr. Krasner and that she would decide "who, if anyone, at MLB [would] be in direct contact with Mr. Gordy's office."

59.     Plaintiff was made to feel that as a Hispanic female she was not qualified to interact with the African-American community, despite the fact that Solomon had given her carte blanch to interact with all constituencies regardless of race, color or national origin.

<u>Robinson Demotes Lind Again by Making Baroody her Supervisor</u>

60.     On February 18, 2014, Robinson informed Baroody and Lind that he would be conducting their performance evaluations.  Robinson had not given Lind a written evaluation, and he told her he had not written one yet.  He stated that he was not sure if he had to do the written evaluation first and said he was going to check with Ray Scott.  In fact, MLB policy requires that an employee be provided with a written performance evaluation prior to the performance evaluation meeting.

61.     In Lind's performance evaluation meeting on February 18, 2014, Robinson was overwhelmingly positive.   Robinson told Lind he saw vast improvement in her work

performance and she was communicating very well with him.  He stated he had observed Lind in meetings and said he was really appreciative of the way she was handling herself and the work. He said to plaintiff "You do not get the respect you deserve around here."  Robinson reiterated that plaintiff had "so much knowledge about so many things" and "so much experience," and he "feel[s] better" when she's at meetings with him because he feels he is "covered."

62.    During the February 18, 2014 performance review meeting, Robinson noted that plaintiff needed to communicate better with Baroody. Lind told Robinson that she updates Baroody about what she is doing, but that he  fails to reciprocate.

63. Robinson informed Lind, almost as an afterthought, that Baroody was being promoted again (the fifth time – or at least, five levels – in two years), and plaintiff would be reporting to Baroody as her immediate supervisor. Robinson gave no substantive reason for his decision, other than to say that he could not be in New York as much as before, and "someone has to be in charge while [he's] gone."  Lind informed Robinson she was extremely disturbed by this decision, because comparatively speaking, Baroody, a young white male, did not have the same or close to the same educational credentials, and had neither the professional license nor the substantial employment experience and considerable industry knowledge she had in MLB. Robinson insisted he was not trying to "get rid of" plaintiff or "push [her] out," and begged her to "give [him] a year." Lind replied saying she did not believe she could do that.

<u>Retaliatory Performance Evaluation from Robinson</u>

64.    On Monday, March 17, 2014, plaintiff received an automated email informing her she had "an action required" on her written performance appraisal.  She had not been previously informed by Robinson or his assistant that a written evaluation had even been drafted. The

evaluation fundamentally contradicted what Robinson said to Lind on February 18, 2014, was in retaliation for plaintiff's opposition to Baroody's promotion over her and was overwhelmingly disparaging, prejudicial, libelous, and caused plaintiff great distress.

65.     Lind responded to the performance review on or about Sunday, April 6.  In her response, plaintiff gave defendants notice of what she had already made clear to Robinson, that Robinson's actions were discriminatory.  She wrote: "It is unfortunate that my supervisor views the evaluation process as an opportunity for character assassination.  What is contained here is merely a pretextual attempt to dismiss my considerable skills and qualifications and justify supplanting me with a young white male."

66.     On or about April 9, 2014, Ron Rydell ("Rydell") of MLB's Human Resources Department called and explained that when employees entered comments on their appraisal, he "like[s] to meet with them."  This assertion, however, is contradicted by the fact that plaintiff also issued a response to her evaluation the prior year, and neither Rydell nor any other member of the human resources department solicited a meeting to further discuss her comments.

67.     On or about Wednesday, April 16, 2014, plaintiff and Rydell met for close to 2 ½ hours.  He reviewed some of the history of her department and each statement in the written evaluation.  He stated he would meet with Robinson to discuss this matter, and then the three of them would meet.

<u>April 28, 2014 – Retaliatory Disciplinary Action</u>

68.     On April 28, 2014, Robinson called plaintiff from California and directed plaintiff

to go to the Vincent Room at MLB headquarters on the 29th floor at 9:30 a.m. where Baroody and Rydell would be, along with a letter to plaintiff from Robinson.  Robinson said he would be on the phone and they would discuss.

69.    Upon arriving at the meeting on April 28, 2014, Rydell told Lind she was the subject of a Disciplinary Action for "Unprofessional Conduct – Insubordination."

70.    The alleged insubordinate act stemmed from Lind's communication with Karen Chatman, a former business consultant plaintiff (as well as others in the department) dealt with when she worked for Jimmie Lee Solomon.

71.    Robinson blamed plaintiff  for  "assuming things" when plaintiff, in her email to Ms. Chatman (which had been approved in advance by Robinson), asked Ms. Chatman to "let us know" if she was no longer represented by a former baseball player turned agent with whom their department had been dealing.

72.    Plaintiff had made it a point to discuss and keep Robinson informed of any dealings with Ms. Chatman and he and Baroody had both been copied on the message.

73.    The accusation of insubordination was a pretextual act of retaliation by Robinson against plaintiff for the response she made to her written evaluation.

74.    Lind had never been given a Disciplinary Action in her then-over eighteen years with MLB.

75.    This sanction by Robinson, permitted by defendants BOC and Selig, was in direct retaliation for the notice plaintiff gave to MLB about his and their discriminatory practices.

76.    On or about April 29, 2014, plaintiff met her friend and former colleague, Ana Rivas (formerly Ana Cariello) for lunch.

18

77.     While enjoying their lunch outside of MLB headquarters, Rivas saw Rydell pass by and confided to Lind that she had been meeting with Rydell to discuss her own employment issues. Later that week, Rivas told Lind that afterwards Rydell had told Rivas that he had seen her together with Lind and said, in substance, "I'm not going to tell you who to hang out with, but you may not want to spend time with her; she's angry."

78.     Rivas told Lind she explained to Rydell that she had reported to Lind and that they had been friends for many years.

79.     Rydell's warning to Rivas about Lind reflected his and MLB's retaliatory animus toward Lind.

### May 20, 2014 – Follow up Meeting – Robinson's Blatant Discriminatory Remark

80.     On or about May 20, 2014, plaintiff's unit was scheduled to have a department meeting "around 2:30," which led Lind to believe it was a "wrap-up," meeting since it was Robinson's last day in the office for a few weeks.

81.     When Lind arrived, Baroody and Rydell were in the office with Robinson. They had plaintiff's "amended" performance review in their hands.  After plaintiff read the amended review, the meeting commenced.

82.     Robinson spoke for quite some time, addressing a myriad of topics, claiming Lind's recollection of the "oral" evaluation was vastly different than his, that last year's review was "not what [he] wanted to write but [she] needed a "wake-up call," admitting that plaintiff is "a very smart young woman" but alleging that she has "a lot of things [she] need[s] to work on," saying that for all the time she had been at MLB she should be "higher"  (in title and pay), but

that she blames everyone else and "needs to look in the mirror because the problem is you," without specifying what the alleged problem was.

83.     Robinson stated that he had done something he had never done in 60 years in baseball and that was "invest in someone."  He said he "invested" in plaintiff and he "got kicked in the face."  He said he had "said things to try to make plaintiff better" and, in his view, plaintiff responded with "personal attacks."  Robinson was unable to articulate what constituted this alleged "investment."

84.     Robinson asserted that when he hires someone he does not see color or gender. He also went into a non-sequitur about the "type" of people available to hire and that "people of color, there are very few of us in this building" and contending that there are very few people of color or women among the intern pool.

85.     Astonishingly, Robinson went on to say that, "Sometimes you have to hire a man because there are places women can't go.  Well, I guess they can go most places now, but sometimes it's easier to hire a man because of what it is they'll be dealing with."

86.     Rydell and Baroody were witnesses to Robinson's statement, but did not disagree or challenge Robinson's discriminatory and retaliatory statements.

87.     In the same meeting Robinson later stated to Lind that he had been told by Rydell that he needed to communicate with plaintiff more when he was unhappy with her work.  He unequivocally, aggressively and offensively stated to Lind that he would not do that, because if he did, "we would be doing it every day and there wouldn't even be time to do any work.   He told Rydell that he will never again have a serious conversation with plaintiff alone.

88.     Rydell wrapped up the meeting by threatening Lind that with the disciplinary action already issued, "any insubordination or violation of the employee handbook" could subject plaintiff to further discipline, and that Lind should keep that in mind.

89.     In or about July 2014, plaintiff was directed to report to a conference room at MLB headquarters to submit to a urinalysis test for the detection of controlled substances and/or alcohol.  Lind tested negative.

90.     Although MLB employees annually receive notification that they, like the baseball players, are subject to drug testing, during her nearly two-decade tenure at MLB – BOC, Lind had never been directed to submit to drug and alcohol testing.

91.     Upon information and belief, defendants subjected plaintiff to testing in an attempt to find alcohol in her system in an effort to substantiate Robinson's allegations and to seek cause to terminate her employment at MLB.

92.      This attempt by defendants to require a drug and alcohol screening in an effort to substantiate Robinson's allegation was in direct retaliation for the notice plaintiff gave to MLB about its discriminatory practices.

Continuing Discrimination and Retaliation following Lind's filing of her Complaint

93.     On December 11, 2014, Lind filed her first Complaint in this action.

94.     On or about February 2, 2015, Robinson was removed from his position as Executive Vice President of Baseball Development.   Lind was neither considered for nor given the position.

95.     At or around the time that Robinson was removed from his position, Daniel

Halem, MLB Chief Legal Officer, informed Lind that Robinson's department, Baseball

Development, was being eliminated.

96.     In or around January 29, 2015, Lind was demoted to a position in MLB's Special

Events Department, reporting to a non-Hispanic white male who was at the same time promoted

to be a Vice President.

97.     Despite the fact that Lind was told that the Baseball Development Department

was eliminated, Baroody remained in his position as Senior Director of Baseball Development.

98.     As part of Lind's responsibilities in the Special Events Department, Lind

continued to work on the Civil Rights Game.

99.     On or about March 26, 2015, Lind was moved from an office to a cubicle.

100.    Since the inception of the Civil Rights Game in 2007, Lind had spearheaded all

activities and in particular had been very involved in the selection of the honorees.  For the 2015

game, MLB conducted meetings and conference calls with the Host Club and selected Robinson

as the honoree without her input.

101.    The cumulative effect of being passed over and demoted, being moved to a

cubicle, working  on an event honoring the man who discriminated against her, and having to

give lip service to MLB's purported dedication to diversity, caused Lind to suffer severe

emotional distress including panic attacks and debilitating depression.

102.    As a result of Lind's severe depression and panic attacks, she went out on short-

term disability on or about March 30, 2015.

<u>Defendants Discriminatory Policies and Practices</u>

103.    As a 49-year old Hispanic female in the white male dominated industry of Major League Baseball, plaintiff has been underpaid, not given appropriate promotions, and not been considered for positions for which she was qualified.

104.    Since plaintiff's arrival at MLB in November, 1995, upon information and belief, there have been a total of only four Hispanic individuals, all males, among MLB Properties, the Office of the Commissioner and MLB Advanced Media, who have achieved a title of Vice President or above. They are Lou Melendez, who was Vice President of International Baseball Operations and was, upon information and belief, "encouraged" to take early retirement; Julio Carbonell, who was Vice President of Information Technology and was dismissed from employment with MLB in 2008; John Quinones, current Vice President of Recruiting; and Steve Gonzalez, current Senior Vice President of Labor.

105.    There are currently no fewer than fifty-two individuals who hold the title of Vice President or above; upon information and belief, Quinones and Gonzalez are the only Hispanics.

106.    Of the fifty-two MLB Vice Presidents as of December 2014, only twelve were women; and of the twelve women, there were only two  minority female Vice Presidents, neither of whom are Hispanic.

107.    Upon information and belief,  no Hispanic females hold the title of Vice President or above within MLB's executive branch, nor have any held such a title during plaintiff's two-decades tenure.

108.    Upon information and belief, defendant Robinson lacked the educational credentials, professional license and executive experience to qualify as an Executive Vice President in a business oriented department in BOC for which he was paid over $1 million.

109.    When Robinson first joined BOC as the first Vice President of On-Field Operations, he hired a white male in his twenties as his right hand.  When that person left to work for the Texas Rangers, he hired another white male in his twenties to replace him.  Upon being appointed Executive Vice President of Baseball Development, he recruited Baroody, a white male in his twenties into the department, promoting him five levels in less than two years.

110.    Baroody lacks the professional license, industry knowledge and executive experience to qualify as plaintiff's supervisor, receive five promotions and be paid more than plaintiff.

111.    The practice and pattern of shunning older Hispanic females and hiring young, white males to be afforded the opportunities to achieve the title of Vice President is supported, encouraged and permitted by the Office of the Commissioner Baseball (BOC) and Selig.  This was made crystal clear when Robinson stated: "Sometimes you have to hire a man because there are places women can't go.  Well, I guess they can go most places now, but sometimes it's easier to hire a man because of what it is they'll be dealing with."

112.    Selig and officials of MLB cannot state they are unaware of plaintiff's qualifications.  In 2006, Lind was honored in Albany, New York by the New York State Hispanic Legislative Caucus women's organization "Entre Nosotras" and New York State Assemblywoman Carmen Arroyo as the highest ranking Hispanic female in Major League

Baseball. Shortly thereafter, defendant Selig sent her a congratulatory letter for receiving this award and recognition.

113.a) Before Robinson became her boss, Lind was not rewarded with commensurate title and salary, although she was given extraordinary responsibility and the latitude to exercise significant professional discretion.  She served as the point person on numerous matters, dealing directly with MLB Club Owners, Presidents, General Managers and other Baseball Operations personnel; Minor League Club Owners, Presidents and personnel; media members and various outside partners.

113.b)  In the fall of 2012 and the beginning of 2013, plaintiff was assigned as a Baseball Operations liaison to two World Baseball Classic ("WBC") teams, as she had been for the 2006 and 2009 WBC, even though she no longer worked in Baseball Operations.  Plaintiff regularly volunteered to assume more responsibility at the WBC venues; however, instead of appointing her to the San Juan, Puerto Rico venue where all four participating teams were Spanish speaking, defendants instead opted to appoint a non-Spanish speaking African-American male as a venue a coordinator, making plaintiff feel that even where it was most necessary, the services of a Hispanic employee were not welcome.

113.c) Plaintiff was consistently chosen to be MLB's spokesperson when interacting with the Hispanic media market on the Civil Rights Game, conducting several radio and television interviews, and plaintiff annually introduced the "Baseball & the Civil Rights Movement Roundtable" moderator live on mlb.com;

113.d) Plaintiff has been lauded by certain MLB departments, outside partners and participants in the Civil Rights Game both for her vision, intelligence and creativity, and the fact

that each CRG has been a well-executed event,  despite the dearth of support (and, most often substantive opposition) outside the Baseball Development department.

113.e)  Plaintiff is still held in high regard by Minor League Baseball and MLB Club Baseball Operations personnel, with whom she worked closely for more than a decade.

113.f)  Plaintiff was told by defendant Robinson that her writing was "poor," yet she regularly wrote substantive memoranda and analyses while working with Solomon that he submitted directly to MLB owners and/or BOC. Plaintiff wrote an acceptance speech for a Pulitzer Prize nominee and one of the most renowned authors and poets of our time, Maya Angelou, shortly before her death.  Dr. Angelou told Lind it was "very good" and changed only two or three sentences.  Individuals who viewed the recorded speech, including "Good Morning America" anchor Robin Roberts (who was a friend of Angelou's) hailed it as "classic Maya" even though they were actually plaintiff's words.

113.g)  Robinson himself told plaintiff that he "liked to have [her] at meetings" because he felt "covered," due to plaintiff's "incredible experience, knowledge and intelligence."

113.h) Further, during the entire time Robinson has known plaintiff, Robinson has lauded her as "a real baseball person," both directly to plaintiff and to others.

114.    Exacerbating defendants BOC's, MLB's and Selig's discriminatory conduct is that the very nature of plaintiff's job is to plan, advance and promote an event (the Civil Rights Game) that perpetuates the fallacy that BOC, MLB and Selig truly cared about diversity and equality.  It has been plaintiff's continuous responsibility to "carry the water" explaining how conscientious BOC, MLB and Selig are about rights for all, when, in fact, plaintiff has experienced, all too well, that there is a very selective application of such rights.

115.     While plaintiff has always maintained a professional demeanor to the public and endeavored to do what is in the best interest for defendants BOC, MLB, and Selig, it has been extremely disheartening, utterly demoralizing and extraordinarily taxing on her, both emotionally and psychologically, to almost singlehandedly perpetuate what she has known to be the diversity and equal employment opportunity falsehood.

FIRST CAUSE OF ACTION
(Sex Discrimination under Title VII against BOC)

116.     Plaintiff repeats and re-alleges paragraphs 1 through 115 above as if fully set forth herein.

117.     By the acts and practices described above, including but not limited to hiring less qualified males in managerial and executive positions, creating a hostile work environment for plaintiff because of her sex and failing to consider, interview, appoint and promote plaintiff to an executive position she was fully qualified to perform, demoting plaintiff and giving her job responsibilities to a less qualified man, BOC discriminated against Lind in the terms and conditions of her employment on the basis of her sex, in violation of Title VII.

118.     Defendant BOC is liable as plaintiff's "employer" under to Title VII for the discrimination against plaintiff.

119.     Defendant BOC intentionally discriminated against Lind with malice and/or reckless indifference to her federally protected rights.

120.     Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress and monetary damages as a result of BOC's discriminatory acts.

## SECOND CAUSE OF ACTION
### (Sex Discrimination under the Administrative Code against BOC, Selig and Robinson)

121.    Plaintiff repeats and re-alleges paragraphs 1 through 120 above as if fully set forth herein.

122.    By the acts and practices described above, including but not limited to hiring less qualified males in managerial and executive positions, creating a hostile work environment for plaintiff because of her sex and failing to consider, interview, appoint and promote plaintiff to an executive position she was fully qualified to perform, and demoting plaintiff and giving her job responsibilities to a less qualified man, BOC, Selig and Robinson discriminated against Lind in the terms and conditions of her employment on the basis of her sex, in violation of the Administrative Code.

123.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Administrative Code for the discrimination against plaintiff.

124.    Defendant Selig is liable under the Administrative Code as an "aider and abettor" of the discrimination against plaintiff.

125.    Defendant Robinson is liable under the Administrative Code as an "aider and abettor" of the discrimination against plaintiff.

126.    Defendants BOC, Selig and Robinson intentionally discriminated against Lind with malice and/or reckless indifference to her protected rights under the Administrative Code.

127.    Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress and monetary damages as a result of BOC's, Selig's and Robinson's discriminatory acts.

28

THIRD CAUSE OF ACTION
(National Origin Discrimination under Title VII Against BOC)

128.     Plaintiff repeats and re-alleges paragraphs 1 through 127 above as if fully set forth herein.

129.     By the acts and practices described above, including but not limited to, defendants' failure to consider, interview, appoint and promote qualified Hispanics to managerial and executive positions, creating a hostile work environment for plaintiff because of her national origin, and failing to consider interview appoint and promote plaintiff to an executive position she was fully qualified to perform, demoting plaintiff and giving her job responsibilities to a less qualified non Hispanic man, BOC discriminated against Lind in the terms and conditions of her employment on the basis of her national origin, in violation of Title VII.

130.     Defendant BOC is liable as plaintiff's "employer" pursuant to Title VII for the discrimination against plaintiff.

131.     Defendant BOC intentionally discriminated against Lind with malice and/or reckless indifference to her federally protected rights.

132.     Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress and monetary damages as a result of BOC's discriminatory acts.

FOURTH CAUSE OF ACTION
(National Origin Discrimination under the Administrative Code
Against BOC, Selig and Robinson)

133.     Plaintiff repeats and re-alleges paragraphs 1 through 132 above as if fully set forth herein.

29

134.    By the acts and practices described above, including but not limited to, defendants' failure to consider, interview, appoint and promote qualified Hispanics to managerial and executive positions, creating a hostile work environment for plaintiff because of her national origin, and failing to consider interview appoint and promote plaintiff to an executive position she was fully qualified to perform, demoting plaintiff and giving her job responsibilities to a less qualified non Hispanic man, BOC, Selig and Robinson discriminated against Lind in the terms and conditions of her employment on the basis of her national origin, in violation of the Administrative Code.

135.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Administrative Code.

136.    Defendant Selig is liable under the Administrative Code as an "aider and abettor" of the discrimination against plaintiff.

137.    Defendant Robinson is liable under the Administrative Code as an "aider and abettor" of the discrimination against plaintiff.

138.    Defendants BOC, Selig and Robinson intentionally discriminated against Lind with malice and/or reckless indifference to her protected rights under the Administrative Code.

139.    Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress  and monetary damages as a result of BOC's, Selig's and Robinson's discriminatory acts.

FIFTH CAUSE OF ACTION
(Retaliation under Title VII Against BOC)

140.    Plaintiff repeats and re-alleges paragraphs 1 through 139 above as if fully set forth herein.

30

141.     By the acts and practices described above, including but not limited to, demoting plaintiff, subjecting plaintiff to a disciplinary action, forcing plaintiff to provide a urine sample for controlled substance and/or alcohol testing, and moving plaintiff from an office into a cubicle, BOC retaliated against plaintiff for her opposition to defendants' discriminatory practices including the complaint that she was "supplanted by a young white male" and for having filed a charge of discrimination  with the EEOC in violation of  Title VII.

142.     Defendant BOC is liable as plaintiff's "employer" pursuant to Title VII for the retaliation against plaintiff.

143.     Defendant BOC intentionally retaliated against Lind with malice and/or reckless indifference to her federally protected rights.

144.     Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress and monetary damages as a result of BOC's discriminatory acts.

## SIXTH CAUSE OF ACTION
### (Retaliation under the Administrative Code Against BOC, Selig and Robinson)

145.     Plaintiff repeats and re-alleges paragraphs 1 through 144 above as if fully set forth herein.

146.     By the acts and practices described above, including but not limited to, demoting plaintiff, subjecting plaintiff to a disciplinary action, forcing plaintiff to provide a urine sample for controlled substance and/or alcohol testing, and moving plaintiff from an office into a cubicle, defendants retaliated against plaintiff for her opposition to defendants' discriminatory practices including the complaint that she was "supplanted by a young white male," in violation of the Administrative Code.

31

147.    Defendant BOC is liable as plaintiff's "employer" pursuant to the Administrative Code for the retaliation against plaintiff.

148.    Defendant Selig is liable under the Administrative Code as an "aider and a bettor" of the retaliation against plaintiff.

149.    Defendant Robinson is liable under the Administrative Code as an "aider and abettor" of the retaliation against plaintiff.

150.    Defendants BOC, Selig and Robinson intentionally retaliated against Lind with malice and/or reckless indifference to her protected rights under the Administrative Code.

151.    Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress and monetary damages as a result of BOC's, Selig's and Robinson's retaliatory acts.


PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

(a)    declaring the acts and practices complained of herein are unlawful and in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, and the Administrative Code of the City of New York §8-107;

(b)    enjoining and permanently restraining these violations of Title VII and Administrative Code;

c)    directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

d)      directing defendants to place plaintiff in the position she would be in but for defendants' discriminatory and retaliatory treatment of her, and to make her whole for reputational damage, damage for emotional distress and all earnings she would have received but for defendants' discriminatory and retaliatory treatment including, but not limited to, wages, bonuses, equity interests, pension and other lost benefits;

e)      directing defendants to pay plaintiff compensatory and punitive damages as provided by Title VII and the Administrative Code;

f)      awarding plaintiff such interest as is allowed by law;

g)      awarding plaintiff her reasonable attorney fees and costs; and

h)      granting such other and further relief as this Court deems necessary and proper.


Dated: New York, New York
       October 21, 2015               /s/_____
                                      Laura S. Schnell
                                      Eisenberg & Schnell LLP
                                      233 Broadway, Suite 2704
                                      New York, New York 10279
                                      (212) 966-8900


                                      /s/_____
                                      Daniel L. Alterman
                                      Alterman & Boop LLP
                                      99 Hudson Street – 8th Floor
                                      New York, New York 10013
                                      (212) 226-2800

                                      *Attorneys for Plaintiff*